FILED
2015 Aug-31  PM 05:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LESLIE HENDERSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:14-cv-01269-MHH** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 1383(c)(3), plaintiff Leslie Henderson seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Henderson's claim for supplemental security income.[1] For the reasons stated below, the Court reverses and remands this case to the Commissioner for further consideration.

## PROCEDURAL HISTORY

On January 13, 2010, Mr. Henderson applied for supplemental security income. (Doc. 7-3, p. 22). In his application, Mr. Henderson alleged that his

---

[1] Initially, Mr. Henderson applied for a period of disability and disability insurance benefits and supplemental security income. Mr. Henderson asserted that his disability began in March 2005. Before his hearing before the Administrative Law Judge, Mr. Henderson amended his onset date to January 31, 2010. In doing so, Mr. Henderson acknowledged that he would be eligible for only supplemental security income. (Doc. 7-3, p. 22).

disability began in March 2005.  (Doc. 7-3, p. 22).  The Commissioner denied Mr.

Henderson's claim on November 2, 2010, and Mr. Henderson requested a hearing

before an Administrative Law Judge (ALJ).  (Doc. 7-3, p. 22).  Before the hearing,

Mr. Henderson amended his alleged onset date to January 13, 2010.  (Doc. 7-3, p.

22).  The ALJ held a hearing on June 1, 2012.  (Doc. 7-3, p. 22).  The ALJ denied

Mr. Henderson's claims on August 3, 2012.  (Doc. 7-3, p. 35).  On April 29, 2014,

the Appeals Council declined Mr. Henderson's request for review (Doc. 7-3, p. 2-

6), making the Commissioner's decision final and a proper candidate for this

Court's judicial review.  *See* 42 U.S.C. § 1383(c).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the

ALJ denies benefits and the Appeals Council denies review," the Court "review[s]

the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close

scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir.

2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record

to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is

such relevant evidence as a reasonable person would accept as adequate to support

a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir.

2004).  In making this evaluation, the Court may not "decide the facts anew,

reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

**SUMMARY OF THE ALJ'S DECISION**

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ in this case found that Mr. Henderson has not engaged in substantial gainful activity since January 13, 2010, the alleged disability onset date. (Doc. 7-3, p. 24). The ALJ determined that Mr. Henderson suffers from the following severe impairments: degenerative joint disease, status post total hip arthropathy, degenerative disc disease, depression, post-traumatic stress disorder, polysubstance abuse, and adjustment disorder. (Doc. 7-3, p. 24-25). The ALJ also determined that Mr. Henderson suffers from hypertension, chronic bronchitis, allergic sinusitis, chronic obstructive pulmonary disease, and furunculosis, but the ALJ found that these impairments are not severe. (Doc. 7-3, p. 25). Based on his examination of the medical evidence, the ALJ concluded that Mr. Henderson does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 25).

The ALJ found that in light of his impairments, Mr. Henderson has the residual functional capacity:

> [t]o perform medium work as defined in 20 CFR 416.967(c) except that he could never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs. However, he can occasionally stoop, kneel, crouch, crawl, and engage in activities requiring balance. He should avoid concentrated exposure to extreme cold, heat, uneven or slippery surfaces, extreme noise, and avoid all exposure to the operational control of moving machinery and unprotected heights. His work is limited to simple, routine, and repetitive tasks. He should work in a

4

low stress environment, defined as having only occasional changes in the work setting and he can only have occasional interaction with the public and with coworkers.

(Doc. 7-3, p. 27).  Based on this RFC, the ALJ determined that Mr. Henderson is not able to perform his past relevant work as a garbage man, dishwasher, stocker, and fishing lure maker.  (Doc. 7-3, p. 34).  Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Henderson can perform, including hand packager, poultry worker, and assembler.  (Doc. 7-3, p. 35).  Therefore, the ALJ concluded that Mr. Henderson is not disabled under the Social Security Act.  (Doc. 7-3, p. 35).

**ANALYSIS**

Mr. Henderson asks this Court to either reverse the ALJ's decision or remand the case for further consideration.  (Doc. 9, p. 12).  Mr. Henderson argues that substantial evidence does not support the ALJ's decision to give Dr. John Neville's opinion only modest weight.  (Doc. 9, p. 8).  Mr. Henderson highlights information in his medical records that supports Dr. Neville's opinion that Mr. Henderson has "a 'moderate to severely impaired' ability to handle ordinary work pressures, and a severely impaired ability to respond appropriately to co-workers." (Doc. 7-3, p. 29; *see also* Doc. 7-12, p. 70).

Dr. Neville is a one-time consultative state examiner.  On April 29, 2010, he conducted a psychological evaluation of Mr. Henderson.   (Doc. 7-12, p. 68).

During his interview of Mr. Henderson, Dr. Neville asked Mr. Henderson a series of questions designed to help Dr. Neville evaluate Mr. Henderson's mental state. (Doc. 7-12, p. 68-71). Dr. Neville also reviewed "[t]he medical evidence of record provided by the DDS" and "considered [those findings] in the overall assessment" of Mr. Henderson. (Doc. 7-12, p. 71). Based on Dr. Neville's observations during the evaluation and his review of the medical evidence of record, Dr. Neville concluded that Mr. Henderson had impaired cognitive functioning, a conclusion that the ALJ considered "largely consistent with the evidence." (Doc. 7-3, p. 33; Doc. 7-12, pp. 70-71). Dr. Neville reported that, "Mr. Henderson appeared irritable and his mood was somewhat labile. Developing rapport with him was difficult." (Doc. 7-12, p. 70). Dr. Neville concluded that Mr. Henderson had a "severely" impaired ability to respond to coworkers, and a "moderately to severely impaired" ability to respond to work pressures. (Doc. 7-12, p. 71). The ALJ concluded that Dr. Neville's opinion about Mr. Henderson's ability to respond to coworkers and to work pressures was "inconsistent with the weight of the evidence." (Doc. 7-3, p. 33). Consequently, the ALJ gave this aspect of Dr. Neville's opinion only modest weight. (Doc. 7-3, p. 33).

An ALJ does not have to defer to the opinion of a one-time examining physician, *Crawford*, 363 F.3d at 1160 (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)), and an ALJ "may reject the opinion of any physician when

6

the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006). When explaining the weight given to a medical opinion, an ALJ does not have to refer specifically "to each piece of evidence in the record, but [the ALJ] must sufficiently explain the weight given to 'obviously probative exhibits.'" *Cooper v. Comm. of Social Sec.*, 521 Fed. Appx. 803, 808 (11th Cir. 2013) (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). The ALJ's decision should enable "the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." *Lewen v. Comm'r of Soc. Sec.*, 605 Fed. Appx. 967, 968 (11th Cir. 2015). If the record viewed in its entirety indicates that the ALJ "focus[ed] upon one aspect of the evidence and ignor[ed] other parts of the record," then the reviewing court "cannot properly find that the administrative decision is supported by substantial evidence. It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence. The review must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).

In discounting Dr. Neville's opinion regarding Mr. Henderson's ability to respond to co-workers and to handle ordinary work pressures, the ALJ acknowledged that mental health treatment records that post-date Dr. Neville's report indicate that Mr. Henderson has "difficult[y] interacting with people" and that "he '[d]istances himself' from people." (Doc. 7-3, p. 29). The ALJ found,

though, that the weight of the evidence indicated that Mr. Henderson's mental health symptoms were not severe enough to be disabling.  The ALJ noted that Mr. Henderson has friends and a girlfriend, gets along well with his family members, and is often pleasant and cooperative with medical personnel.  (Doc. 7-3, p. 33).  In addition, the ALJ found that Mr. Henderson's GAF scores in the range of mid 50-60s indicated "moderate" to "mild" symptoms.  (Doc. 7-3, p. 33).  The ALJ stated that Mr. Henderson "routinely denies psychotic symptoms and suicidal or homicidal ideations," and the ALJ cited a medical record from May 2011 that states that Mr. Henderson had "'only mild remaining depressive [symptom[s]],' which are 'related to stressors.'"  (Doc. 7-3, p. 29).  The ALJ concluded that Mr. Henderson's GAF scores combined with his ability to live independently suggest that Mr. Henderson is able to handle stress and pressure at a basic level.  (Doc. 7-3, p. 33).

The ALJ's opinion does not mention that a brief screening for depression in January 2006 produced a positive result.  (Doc. 7-12, p. 100).  Mr. Henderson's primary care physician rendered an official diagnosis of depression in April 2010 (Doc. 7-12, pp. 26-28) and made a diagnosis of anxiety one year later.  (Doc. 7-16, p. 82).  On April 16, 2010, the V.A. psychiatrist who Mr. Henderson visited noted that Mr. Henderson complained that he had had trouble sleeping for the previous seven-to-eight years.  (Doc. 7-12, p. 27).  Mr. Henderson reported that he slept 1-2

hours per night while taking the insomnia medication Trazodone.  (Doc. 7-12, p. 44).  Since 2010, Mr. Henderson's V.A. mental health records consistently have reflected that Mr. Henderson sleeps only two-to-three hours per night, and he is frequently awakened by nightmares.  (Doc. 7-12, p. 27; Doc. 7-15, p. 29;  Doc. 7-16, pp. 81, 84;  Doc. 7-17, pp. 6, 17).

Information about Mr. Henderson's nightmares appears frequently in his mental health records.  Mr. Henderson's V.A. mental health treatment notes from July 2011 describe Mr. Henderson as an individual suffering with depression and PTSD who has related symptoms of "labile mood, irritab[ility], [and] over-reactive, internalized rage."  The record states that Mr. Henderson was "withdrawn and detached from others, guarded, [and] hypervigilant," and he had "dreams and nightmares that frequently interrupt his sleep."  (Doc. 7-16, p. 51-52).   On February 16, 2012, the V.A. psychiatrist who Mr. Henderson visited noted that Mr. Henderson has a history of PTSD and depression and wrote that Mr. Henderson "had nightmares in the past four days, about people trying to murder him and him trying to defend himself.  For the last two days, he woke up with his gun in his hands." (Doc. 7-17, p. 17; *see also* Doc. 7-17, p. 21).  Mr. Henderson also reported that he had flashbacks 2-3 times per day.  (Doc. 7-17, p. 17).

Beyond the nightmares and flashbacks, Mr. Henderson has experienced suicidal thoughts.  On July 13, 2011, the V.A. psychiatric social worker who Mr.

Henderson saw noted that Mr. Henderson has impulsive suicidal thoughts when he feels like he "don't care anymore."   (Doc. 7-16, p. 52).   The February 2012 medical record indicates that Mr. Henderson tried to hurt or kill himself one year earlier.   (Doc. 7-17, p. 20; *see also* Doc. 7-17, p. 46).   His suicide risk was documented as "mild," and he reported a "very supporting" romantic relationship. (Doc. 7-17, pp. 17, 20).   Still, virtually all of Mr. Henderson's mental health records reflect that V.A. psychiatrists and social workers routinely gave Mr. Henderson instructions about steps to take if he began to feel hopeless or suicidal, and Mr. Henderson reported that he relies on his faith when his thoughts become hopeless. (Doc. 7-12, p. 29; Doc. 7-16, pp. 32, 52, 54, 84; Doc. 7-17, pp. 2, 7, 9, 20, 46).

Mr. Henderson's mental health records reflect that he has difficulty interacting with people. A V.A. record from July 15, 2010 states that Mr. Henderson avoids all people because it seems to him that "'everybody has it out for [him].'"   (Doc. 7-15, p. 29).   On April 11, 2011, the psychiatric social worker who Mr. Henderson visited reported that Mr. Henderson distances himself from all people because "people just be aggravating."   (Doc. 7-13, p. 64).   Mr. Henderson's February 2012 mental health record states that Mr. Henderson was struggling with "a pervasive emotion of anger" which Mr. Henderson used as a defense mechanism and that Mr. Henderson has a "generalized distrust of others."   (Doc. 7-

17, p. 46).  That record continues:  "[Mr. Henderson has] some symptoms of PTSD such as re-experiencing through dreams and intrusive memories; hyperarousal such as irritability, anger, hypervigilance and distrust; avoidant traits such as detachment and isolation, suppression of emotions except for anger. . . . [Mr. Henderson] emphasized the need to be hypervigilant and to defend himself." (Doc. 7-17, p. 46).

With respect to Mr. Henderson's ability to respond to coworkers, Mr. Henderson reported to Dr. Neville that he stopped working in 2008 in part because of conflicts with coworkers.  (Doc. 7-12, p. 69).  A V.A. record from April 2011 states that Mr. Henderson's "[m]ain source of distress tolerance has been helping his brother tend to his horses every other day . . ." (Doc. 7-13, p. 64).  In addition, a V.A. record from May 2011 states that Mr. Henderson had conflicts with his brothers while he cared for his ailing father.  (Doc. 7-15, p. 29).   A record dated November 2011 states that cognitively Mr. Henderson may get worse over time absent efforts toward recovery from trauma.  (Doc. 7-17, p. 46).

Mr. Henderson's mental health records from the V.A. support Dr. Neville's opinion.  Based on the ALJ's decision, the Court cannot tell whether the ALJ fully considered these mental health records or incorporated this information concerning Mr. Henderson's mental health at any stage of his analysis of Mr. Henderson's case.  The ALJ did not state how much weight he gave to records from Mr.

11

Henderson's V.A. psychiatrists and psychiatric social workers.  (Doc. 7-3, p. 24-35).  After reviewing the ALJ's decision, this Court cannot conclude that the ALJ considered the claimant's medical condition as a whole.  Therefore, the Court remands the case to the ALJ to assess the weight to be given to Mr. Henderson's V.A. mental health records and the weight to be given to Dr. Neville's opinion in light of Mr. Henderson's V.A. records.  The Court finds no error in the ALJ's analysis of Mr. Henderson's physical impairments.

**CONCLUSION**

For the reasons discussed above, the Court remands this action to the Commissioner for further proceedings consistent with this memorandum opinion. The Court will enter a separate final order.

**DONE** and **ORDERED** this August 31, 2015.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE